OPINION
{¶ 1} Defendant-appellant, Joyce E. Hall ("appellant"), appeals from the judgment of the Franklin County Court of Common Pleas whereby the trial court convicted appellant of felonious assault with a firearm specification, pursuant to a jury trial.
 {¶ 2} The Franklin County Grand Jury indicted appellant of felonious assault with a firearm specification, a second-degree felony, in violation of R.C. 2903.11 and 2941.145, respectively. The charges stem from appellant shooting her former husband, Ralph Hall ("Hall"), with a firearm on October 4, 2003. (Hereinafter, we will refer to Joyce Hall as "appellant" and Ralph Hall as "Hall.") Specifically, the felonious assault charge alleged that appellant "did knowingly cause or attempt to cause physical harm to [Hall] by means of a deadly weapon or dangerous ordnance[.]"
 {¶ 3} Appellant pled not guilty, and her defense counsel asserted self-defense based on battered woman syndrome. Defense counsel retained psychologist Dr. Lee Howard to provide expert testimony on the battered woman syndrome defense.
 {¶ 4} Before trial, plaintiff-appellee, the State of Ohio, asked to question Dr. Howard about his experience, and the trial court held a hearing to allow the parties to question Dr. Howard. At the hearing, Dr. Howard testified to the following. Dr. Howard had been a psychologist since 1980, and he is licensed in Ohio and Kentucky. Dr. Howard received his doctorate in psychology and is a nationally board certified forensic psychologist with the American Board of Psychological Specialties. He has dealt with people with battered woman syndrome in his practice and has studied literature on the subject. At the end of the hearing, the trial court concluded that it would allow Dr. Howard to testify as an expert on the battered woman syndrome defense.
 {¶ 5} Thereafter, a jury trial commenced. During opening statements, appellee started to mention the elements of self-defense. Appellant's defense counsel objected, stating that appellee was going "beyond the scope of opening." (Tr. at 32.) The trial court overruled the objection.
 {¶ 6} Additionally, during opening statements, appellee stated that Hall "didn't want to prosecute this case. He won't come to testify. * * * He doesn't want to have anything to do with this." (Tr. at 29-30.) Defense counsel did not object to appellee's comments.
 {¶ 7} On appellee's behalf, witnesses testified that they observed appellant fire multiple shots at Hall while appellant and Hall were at a gas station. Witnesses noticed that appellant first fired three shots at Hall while he was inside an automobile. The witnesses also testified that appellant fired additional shots at Hall after he exited the automobile and fled. Moreover, according to the witnesses, when appellant ran out of bullets, Hall returned and hit appellant with the firearm. One witness, Damian Smith, testified that he heard appellant yell: "I'm tired you crackhead" before she fired the shots and "[h]elp me, I'm tired, I can't take this no more" while Hall beat her. (Tr. at 49-50.)
 {¶ 8} Columbus Police Officer Martin Jaeger testified that he arrived at the scene and discovered that Hall had sustained wounds near his left eyebrow and on his back. Officer Jaeger noted that Hall told him that he was on his way to Alabama.
 {¶ 9} Columbus Police Officer Terry Stuart also arrived at the scene and testified that he spoke with appellant about the incident. Officer Stuart testified that appellant was rambling that she gave Hall "12, 13, 14 good years and it wasn't good enough" and "that she gave [Hall] everything she had," and that "she just couldn't take it anymore." (Tr. at 141.) Officer Stuart also testified that appellant told him the following. Appellant drove Hall to a bank machine because he wanted money to leave town. Hall became upset because the machine would not allow appellant to withdraw the amount of money that he wanted. Hall then asked appellant to give him money that she had for her brother's rent. Ultimately, appellant pulled a firearm from her bra.
 {¶ 10} Appellant's defense counsel first called appellant's sister, Barbara Smith ("Smith"), to testify. Defense counsel asked Smith if she knew about Hall abusing alcohol and drugs, but appellee objected. The trial court noted that "it could be what you're asking her fits into the pattern of" battered woman syndrome, but defense counsel needed to establish first whether appellant acted in self-defense during the incident. (Tr. at 163-164.) Defense counsel decided to take Smith off the stand and have appellant testify next.
 {¶ 11} Appellant testified to the following. Appellant married Hall in 1991, but divorced him in 1994 or 1995, only to remarry him the same year of the divorce. However, appellant again divorced Hall in 1998 or 1999. On the day of the shooting, Hall was staying with appellant while he was on a furlough from a drug rehabilitation program. On the day of the shooting, appellant had dropped Hall off at appellant's brother's house. Later that day, appellant came home to discover that Hall had broken in the house; he did not have a key to the house. Hall was high on crack cocaine and "raving." (Tr. at 180.) Hall told appellant that he wanted her to withdraw money from a bank machine and give it to him so that he could go Alabama, his home state. However, appellant knew that he wanted the money for drugs. In addition, appellant "was afraid because [she] knew he was high on that crack cocaine" and "in fear of [her] life" because she knew Hall always carried a knife and Hall had threatened her in the past. (Tr. at 181-182.) Before leaving for the bank machine, appellant retrieved a firearm.
 {¶ 12} At the bank machine, Hall wanted $500. However, the machine would only let appellant withdraw $200. Hall was upset because he wanted more money. Hall asked appellant to give him her brother's rent money. He started "threatening and cursing and hollering at [appellant] and calling [her] names, and then he was going to try to snatch my purse * * * and we got physical in the car." (Tr. at 185.) During the struggle, Hall was in a rage and hit appellant. Appellant was in fear of her life and then she "just remember[s] * * * hearing these gunshots." (Tr. at 187.)
 {¶ 13} Defense counsel asked appellant if she remembers shooting the firearm, and appellant reiterated, "I remember the gunshots. I know I had the gun[.]" (Tr. at 187.) Appellant indicated that she next remembers being on the ground trying to gather her belongings and seeing a man standing over her telling her everything was going to be okay. Appellant also testified that she sustained bruises from the incident.
 {¶ 14} Next, appellant testified to the following about her relationship with Hall. Hall abused drugs and would ask for money to pay for his addiction. He would be very aggressive and threatening when he asked for money. Hall approached appellant in this manner, asking for money, "[m]ore than 50 times[.]" (Tr. at 210.) Hall had also threatened to hurt appellant with a knife, and Hall had hit her before. Hall would be abusive "[w]hen he wants money for crack cocaine[.]" (Tr. at 212.) Hall had hit her three or four times in the past.
 {¶ 15} After Hall was abusive, he would apologize and indicate that he would not hit her again. However, he would subsequently continue the abuse and, at one time, appellant filed domestic violence charges against Hall.
 {¶ 16} After appellant testified, defense counsel re-called Smith to testify. Smith confirmed that Hall had abused appellant and that appellant expressed being afraid of Hall. Moreover, Smith testified about appellant being a truthful person. Defense counsel also called other witnesses to testify about Hall's abusive relationship with appellant and to testify about appellant being a truthful person.
 {¶ 17} In the middle of appellant's case, the parties were discussing jury instructions, and the trial court asked defense counsel if he wanted to include any lesser-included offenses to felonious assault. Defense counsel declined.
 {¶ 18} Afterward, appellee stated on the record that it offered to allow appellant to plead to aggravated assault, a fourth-degree felony, with no firearm specification. Appellee noted that, under the plea offer, the trial court could impose community control rather than prison. Appellee stated that, as charged, the trial court would have to impose prison time because of the firearm specification. Appellee's counsel indicated that she wanted to put the plea offer on the record "[j]ust for [her] own peace of mind[.]" (Tr. at 335.)
 {¶ 19} The trial court asked appellant if she understood the offer, and the trial court reiterated that, if the jury convicted appellant of the charged offense, then the court would have to impose prison time because of the firearm specification. However, the trial court noted that, under the plea offer, it would have the option of imposing community control instead of prison. The trial court stated that it was "not twisting [appellant's] arm to do anything, but [it did not] want this whole trial to end and have [the court] wondering whether [appellant] really understood all of these things." (Tr. at 337-338.) Appellant responded that she understood everything that the trial court had explained, and appellant stated that she wanted to proceed with the trial.
 {¶ 20} Next, defense counsel called Dr. Howard to testify. At appellee's request, the trial court allowed appellee's expert witness, psychologist Dr. John Malinky, to observe Dr. Howard's testimony. Defense counsel objected, but the trial court overruled the objection.
 {¶ 21} Dr. Howard reiterated his credentials noted above. Dr. Howard also specified that he dealt with between 50 and 80 women with battered woman syndrome while working in drug treatment programs, and 10 or 12 women with battered woman syndrome while in private practice. Dr. Howard further indicated that he has testified about battered woman syndrome during administrative hearings. In addition, Dr. Howard noted that he has reviewed "multiple literature" on battered woman syndrome and referred to research by Dr. Lenore Walker, the individual who developed battered woman syndrome, and other noted psychiatrists. (Tr. at 343.) After the trial court accepted Dr. Howard as an expert on battered woman syndrome, Dr. Howard indicated that he examined appellant and opined, to a "reasonable scientific psychological certainty that" appellant suffered from battered woman syndrome on the date that she shot Hall in October 2004. (Tr. at 351.) Dr. Howard stated this opinion without defense counsel having the expert testify about underlying facts or data behind the opinion. After Dr. Howard stated the opinion, defense counsel asked: "[W]hat has the research shown as it relates to a battered person if they are removed from that situation as far as recidivism?" (Tr. at 352.) Appellee objected, and the trial court sustained the objection.
 {¶ 22} On cross-examination, Dr. Howard testified that he did not corroborate from independent sources the information that appellant gave to him during the examination. Dr. Howard also stated that appellant only told him about one incident of abuse from Hall, the incident that resulted in the domestic violence charge. Despite this, Dr. Howard emphasized that "[appellant's] perception of what happens is most important. She felt threatened by this individual throughout most of the relationship, particularly when he was using crack cocaine." (Tr. at 396-397.) On re-direct, Dr. Howard testified that he obtained pertinent information about appellant's case through "a pretty normal procedure that pretty much all psychologists and psychiatrists follow." (Tr. at 421.)
 {¶ 23} Dr. Malinky testified on appellee's behalf during appellee's rebuttal. According to Dr. Malinky, the American Psychological Association did not recognize the board from which Dr. Howard received his forensic certification, but Dr. Malinky admitted on cross-examination that he is not certified as a forensic psychologist by any board.
 {¶ 24} Dr. Malinky opined that "I don't believe in my professional opinion there is enough information" to decide whether appellant suffered from battered woman syndrome during the shooting incident. (Tr. at 448.) Specifically, Dr. Malinky indicated that he would need more information about Hall's pattern of abuse. Dr. Malinky also testified that he would need to corroborate the information that appellant provided because he would be examining her for forensic, not therapeutic, purposes. Dr. Malinky explained that "[w]hen you come into a forensic setting it's a critical attitude. I don't know whether you're lying to me or not[.] * * * I have to independently verify" the information. (Tr. at 441.) However, Dr. Malinky admitted on cross-examination that, when he has performed forensic examinations for Bureau of Workers' Compensation assignments, he has not always corroborated the information he received.
 {¶ 25} Furthermore, on cross-examination, Dr. Malinky admitted that Dr. Howard was in a better position to determine appellant's "perceptual basis" "because he saw her." (Tr. at 479-480.) Lastly, during cross-examination, defense counsel did not ask Dr. Malinky about how many times he provided expert assistance to prosecution agencies.
 {¶ 26} Thereafter, during defense counsel's closing argument, defense counsel discussed battered woman syndrome:
But here's the second thing that I want to point out, that the Defendant had an honest belief that he or she was in imminent danger of death or great bodily harm and that her only means of escape from such danger was the use of such force. That is where your whole battered women's syndrome comes in * * *. But this requires you to consider her situation not just that night, you have to go back and consider all of the stuff that she has been through in order to make a decision as to whether she was reasonable that night in that car to do what she did.
(Tr. at 530.)
 {¶ 27} Defense counsel also noted, referencing the jury instruction, that the trial court would subsequently provide:
And the last element of this is that the Defendant did not have a duty to retreat or to avoid danger, and you will also get a jury instruction where the Court will tell you about the extra evidence that we have provided you regarding the battered women's syndrome, but also in that it states that if you do believe that the Defendant was suffering that she had no duty to retreat in that situation.
(Tr. at 530-531.)
 {¶ 28} Next, defense counsel discussed Ralph Hall's unavailability for trial:
[Hall] has gone on with his life. [Appellant] needs to go on with her life. She needs to get back to being a child care worker, * * * allow [appellant] to get back to her life and that she can move on like presumably [Hall] is doing right now * * *.
(Tr. at 542.)
 {¶ 29} Additionally, during closing argument, defense counsel discussed the felonious assault charge, stating:
[Appellant] has already testified before you that she has no memory of even firing this gun, she has no memory of the shots, so by her own testimony she did not in any way state that she knowingly shot [Hall], and you have to assume that if you intend to do something, if it's your purpose to do that it's knowingly, but in this situation you can't do that if you don't even remember. * * *
(Tr. at 527.)
 {¶ 30} Upon making the above comment, the trial court interrupted:
* * * I'm sorry but I can't let you equate purposely and intentionally with knowingly. This case is not about purpose or intent. It's about the lesser mental state of knowingly, and I thinkwhat we probably need to do now I will give an instruction on purpose so that the jury can see the difference between purpose and intent and knowingly.
(Tr. at 527.)
 {¶ 31} Defense counsel responded:
No, it is our point that [appellant] as it relates to her situation there did not have the requisite knowledge and did not knowingly do this. * * *
(Tr. at 527.)
 {¶ 32} After the parties gave their closing arguments, the trial court read the jury instructions, stating, in particular:
If during the course of the trial the Court said or did anything that you consider an indication of the Court's view of the fact's, you're instructed to disregard it.
(Tr. at 584.)
 {¶ 33} As the trial court indicated above, it also defined the mental elements of "purpose" and "knowing" to the jury. The trial court stated, however, that "[b]efore you can find [appellant] guilty of felonious assault you must find beyond a reasonable doubt that on or about the 4th
day of October, 2003, * * * [appellant] knowingly caused or attempted to cause physical harm to [Hall] by means of a deadly weapon." (Tr. at 574.)
 {¶ 34} After giving the jury instructions, the trial court asked the parties if they had any objections to the jury instructions, in particular the trial court's definition of the "purpose" mental element. Neither party objected.
 {¶ 35} During deliberations, the jury asked if they had to agree on all three self-defense elements, or just one. Defense counsel wanted the trial court to respond by reiterating the jury instruction regarding whether appellant "had reasonable grounds to believe and an honest belief that [appellant] was in * * * imminent or immediate danger of death or great bodily harm and that the only means of escape from such danger was by the use of deadly force. In that event [appellant] had no duty to retreat or escape[.]" (Tr. at 581.) In particular, defense counsel wanted to emphasize "that in response to their question as to whether the three elements must be necessary, to the extent that they are going to consider the battered women's syndrome, that third element of the duty to retreat need not be present[.]" (Tr. at 602.)
 {¶ 36} The trial court declined defense counsel's request and, instead, explained that the jury instruction:
* * * [S]pecifically tells [the jury] if in [appellant's] subjective perception of what was going on that the only means of escape from such danger was the use of deadly force, then in that event there's no duty to retreat. So they have been instructed precisely on what you're asking. * * *
(Tr. at 604.)
 {¶ 37} Ultimately, the jury convicted appellant of felonious assault with a firearm specification, and the trial court sentenced appellant accordingly. Appellant appeals, raising two assignments of error:
First Assignment of Error:
DEFENDANT-APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, AND OF A QUALIFIED EXPERT WITNESS.
Second Assignment of Error:
THE TRIAL COURT ERRED BY INSTRUCTING THE JURY, BOTH DURING DEFENSE COUNSEL'S CLOSING ARGUMENT AND IN ITS FINAL CHARGE, UPON THE DEFINITION OF `PURPOSE,' WHEN PURPOSE IS NOT AN ELEMENT OF A CRIME CHARGED, IS NOT AN ELEMENT OF ANY DEFENSE RAISED, THEREBY CASTING THE IMPRESSION OF DISFAVORING THE DEFENDANT'S CLOSING ARGUMENT, HER CASE, AND HER COUNSEL.
 {¶ 38} In her first assignment of error, appellant contends that she is entitled to a new trial because defense counsel rendered her ineffective assistance in violation of the Sixth Amendment to the United States Constitution. We disagree.
 {¶ 39} The United States Supreme Court established a two-pronged test for ineffective assistance of counsel. Strickland v. Washington (1984),466 U.S. 668. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance and, therefore, deficient. Id. at 687. Second, the defendant must show that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. Id. A defendant establishes prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 40} A properly licensed attorney is presumed competent. State v.Samatar, 152 Ohio App.3d 311, 2003-Ohio-1639, at ¶ 88, citing Vaughnv. Maxwell (1965), 2 Ohio St.2d 299, 301. Moreover, there is "`a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]'" State v. Bradley (1989),42 Ohio St.3d 136, 142, quoting Strickland at 689. In matters regarding trial strategy, we will generally defer to defense counsel's judgment.State v. Carter (1995), 72 Ohio St.3d 545, 558; see, also, State v.Carpenter (1996), 116 Ohio App.3d 615, 626, citing Bradley at 144 (holding that we are to "presume that a broad range of choices, perhaps even disastrous ones, are made on the basis of tactical decisions and do not constitute ineffective assistance"). We will only reverse on trial strategy grounds if defense counsel's trial strategy deviated from the standard of reasonableness. State v. Burgins (1988), 44 Ohio App.3d 158,160; State v. Newsome, Ashtabula App. No. 2003-A-0076, 2005-Ohio-3775, at ¶ 8.
 {¶ 41} Likewise, "`[a] failure to prevail at trial does not grant an appellant license to appeal the professional judgment and tactics of his trial attorney.'" Samatar at ¶ 88, quoting State v. Hart (1988),57 Ohio App.3d 4, 10. Defendant is entitled to a "reasonable standard" of representation, "not perfect representation." State v.Cummings (Apr. 21, 1992), Franklin App. No. 90AP-1144. Furthermore, we "must keep in mind that different trial counsel will often defend the same case in different manners." Samatar at ¶ 88, citing Strickland at 689.
 {¶ 42} Here, appellant first claims that defense counsel rendered ineffective assistance by putting on the stand an "underqualified" and "underprepared" expert witness, Dr. Howard. In support of her claim that Dr. Howard was "underqualified," appellant relies on appellee's expert, Dr. Malinky, who testified that the American Psychological Association did not recognize the board from which Dr. Howard obtained his forensic psychology certification. However, "[n]either special education nor certification is necessary to confer expert status upon a witness." Statev. Hartman (2001), 93 Ohio St.3d 274, 285, citing State v. Baston
(1999), 85 Ohio St.3d 418, 423, and State v. D'Ambrosio (1993),67 Ohio St.3d 185, 191.
 {¶ 43} In further support of her argument, appellant contends that Dr. Howard had never treated anyone for battered woman syndrome and had never testified at trial as an expert on battered woman syndrome. However, appellant's claims are disingenuous, given that Dr. Howard has dealt with women who experienced battered woman syndrome and given that Dr. Howard has testified at administrative hearings about battered woman syndrome.
 {¶ 44} Moreover, an expert witness's qualifications stem from the expert's possession of special knowledge that he or she has acquired, either by study of recognized authorities on the subject or by practical experience, that he or she can impart to the jury and that will assist the jury in understanding a pertinent matter. State Auto Mutual Ins. Co.v. Chrysler Corp. (1973), 36 Ohio St.2d 151, 160; Nichols v. Hanzel
(1996), 110 Ohio App.3d 591, 597; see, also, Evid.R. 702 (noting that a witness is qualified as an expert by specialized knowledge, skill, experience, training or education regarding a pertinent subject matter). Likewise:
* * * The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function. * * *
Hartman at 285, citing Baston at 423, and D'Ambrosio at 191.
 {¶ 45} Here, Dr. Howard acquired special knowledge about battered woman syndrome through practical experience. In particular, Dr. Howard had dealt with between 50 and 80 cases of women with battered woman syndrome while working in drug treatment programs, and 10 to 12 more in private practice. We also acknowledge that Dr. Howard acquired special knowledge about battered woman syndrome by studying recognized authorities. Specifically, Dr. Howard testified that he has reviewed literature on the subject and referred to research by Dr. Lenore Walker, the individual who developed battered woman syndrome, and other noted psychiatrists. As such, we reject appellant's contention that Dr. Howard was "underqualified" as an expert in battered woman syndrome and find no ineffective assistance of counsel in this regard.
 {¶ 46} We next address appellant's argument that defense counsel rendered ineffective assistance by not properly ensuring that Dr. Howard was prepared to opine that appellant suffered from battered woman syndrome on the date of the incident. In support, appellant refers to Dr. Malinky's testimony that Dr. Howard did not have sufficient information concerning the shooting and Hall's abusive history. Appellant also points to Dr. Malinky's testimony that Dr. Howard did not sufficiently corroborate information from appellant about the incident and her relationship with Hall.
 {¶ 47} Appellant relies on Wiggins v. Smith (2003), 539 U.S. 510, to argue that a defense counsel renders ineffective assistance by failing to properly prepare an expert to testify at trial. However, Wiggins does not hold as such, but, instead, concerns co-defense counsels deciding to limit their investigation of potential mitigating evidence for capital sentencing. Id. at 521.
 {¶ 48} Indeed, the Ohio Supreme Court has previously declined to hold that a defense attorney rendered ineffective assistance when the attorney allegedly failed to ensure that an expert witness adequately obtained all requisite information to make an expert opinion. State v. McGuire
(1997), 80 Ohio St.3d 390, 399. In McGuire, a defendant argued that an expert witness did not adequately obtain requisite information when preparing to testify on the defendant's behalf. Id. As an example, the defendant claimed that the expert should have performed certain routine tests. Id. Noting that the defendant "appear[ed] to blame defense counsel for this," the Ohio Supreme Court held that it was nonetheless reasonable for defense counsel to defer to the expert's professional judgment, and the court concluded that the defense counsel did not otherwise render ineffective assistance. Id.
 {¶ 49} Here, defense counsel relied on an expert in battered woman syndrome and the expert testified that he obtained pertinent information about appellant's case through "a pretty normal procedure that pretty much all psychologists and psychiatrists follow." (Tr. at 421.) Likewise, Dr. Howard emphasized that "[appellant's] perception of what happens is most important. She felt threatened by this individual throughout most of the relationship, particularly when he was using crack cocaine." (Tr. at 396-397.) Thus, under McGuire, defense counsel reasonably deferred to Dr. Howard's professional judgment in examining appellant and in coming to an opinion based on the examination.
 {¶ 50} Dr. Malinky's opposing testimony does not compel us to conclude otherwise. We note that the Third District Court of Appeals, applyingMcGuire when reviewing a trial court's decision to deny a post-conviction relief petition, recognized that "it is reasonable for counsel to defer to an expert[']s professional judgment regarding matters seemingly within the realm of" the expert's knowledge. State v. Saxton, Marion App. No. 9-03-43, 2004-Ohio-3546, at ¶ 15, vacating State v. Saxton, Marion App. No. 9-03-43, 2004-Ohio-811, citing McGuire at 399. In Saxton, the appellate court declined to find that a defense counsel rendered ineffective assistance when counsel relied on an expert witness who stated an opinion at trial in conflict with an opinion from an expert that the defendant subsequently obtained for post-conviction relief. Id. at ¶ 17, 20. The court reasoned that while the experts presented opposing opinions and while the subsequent expert:
* * * present[ed] a somewhat stronger opinion as to the science, the essential defense point * * *, supported by expert scientific testimony, was presented to the jury in this case. This was accomplished as a direct result of the efforts of trial counsel, both in investigating the scientific aspects of the case with an expert witness and in presenting the results of that investigation effectively to the jury via the testimony of that expert. * * *
Id. at ¶ 19.
 {¶ 51} The appellate court further stated that any difference between the experts related "more to the potential effectiveness of the experts rather than the ineffectiveness of trial counsel." Id. In so concluding, the appellate court realized that "to rule otherwise in this case would elevate a defense counsel's duty of representation to an untenable standard." Id.
 {¶ 52} Here, like Saxton, defense counsel provided a battered woman syndrome defense to the jury with the assistance of an expert, and defense counsel reasonably deferred to the expert's professional judgment in obtaining the requisite information to form an expert opinion. Although appellee presented an expert witness that countered defense counsel's expert, such differences relate "more to the potential effectiveness of the experts rather than the ineffectiveness of trial counsel." Id. at ¶ 19. Accordingly, we find no ineffective assistance of counsel stemming from Dr. Malinky's opinion that Dr. Howard did not have sufficient information to form an opinion on whether appellant suffered from battered woman syndrome during the incident.
 {¶ 53} Next, appellant argues that defense counsel did not understand the relationship between self-defense and battered woman syndrome. Specifically, appellant asserts that defense counsel failed to argue that the battered woman syndrome goes toward appellant not having a duty to retreat. We find, however, that appellant has misstated Ohio law as it relates to the relationship between battered woman syndrome and self-defense.
 {¶ 54} The elements necessary to prove self-defense are well-established. As stated in State v. Robbins (1979), 58 Ohio St.2d 74,79-80, those elements are: (1) the slayer is not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger.
 {¶ 55} R.C. 2901.06(B) allows a defendant to raise battered woman syndrome in connection with a self-defense claim. The battered woman syndrome provides "evidence to establish the requisite belief of an imminent danger of death or great bodily harm" as an element of self-defense. Id. Thus, the Ohio Supreme Court has recognized that evidence of battered woman syndrome goes to the second element of self-defense — whether the slayer had a good-faith belief that she was in imminent danger and that force was her only means of escape. State v.Koss (1990), 49 Ohio St.3d 213, 217. Accord State v. Palmer (Mar. 28, 2000), Franklin App. No. 99AP-175; State v. Mariana (Dec. 30, 1999), Butler App. No. CA98-09-202; State v. VanSickle (July 20, 1995), Franklin App. No. 94APA12-1728.
 {¶ 56} Defense counsel recognized the above relationship between battered woman syndrome and self-defense. As an example, defense counsel mentioned during closing argument that battered woman syndrome applies to the second element of self-defense and that the jury should consider incidents of prior abuse between Hall and appellant when considering battered woman syndrome's application to the second element of self-defense.
 {¶ 57} Likewise, appellant is also mistaken in claiming that defense counsel failed to even address whether appellant had a duty to retreat after establishing the second element of self-defense through battered woman syndrome. During closing argument, defense counsel told the jury that appellant did not have a duty to retreat under such a scenario, and defense counsel referenced the pertinent jury instruction. Furthermore, after the jury asked during deliberations a question about self-defense, defense counsel wanted the trial court to reiterate the portion of the jury instruction that discussed that appellant "had reasonable grounds to believe and an honest belief that [appellant] was in * * * imminent or immediate danger of death or great bodily harm and that the only means of escape from such danger was by the use of deadly force. In that event [appellant] had no duty to retreat or escape[.]" (Tr. at 581.) Accordingly, we reject appellant's contention that defense counsel rendered ineffective assistance because he did not understand the relationship between battered woman syndrome and self-defense.
 {¶ 58} We also find no ineffective assistance of counsel stemming from defense counsel's objection to appellee mentioning during opening statements the legal elements of self-defense. Appellant fails to explain how the objection demonstrates defense counsel's deficient performance or how the objection prejudiced appellant. Appellant's conclusory assertions are insufficient to demonstrate ineffective assistance of counsel. Statev. Buckingham, Montgomery App. No. 19205, 2003-Ohio-44, at ¶ 17.
 {¶ 59} In addition, appellant contends that defense counsel's failure to proffer evidence for the record demonstrated his ineffectiveness. In support, appellant refers to the trial court originally not allowing Smith to testify about Hall's history of abuse, and appellant claims that, in this instance, defense counsel should have proffered Smith's testimony. However, instead of proffering the evidence, defense counsel chose to follow the trial court's suggestion to first demonstrate that appellant acted in self-defense. Once defense counsel did so, defense counsel re-called Smith and other witnesses to testify about Hall's history of abuse. Thus, appellant has failed to demonstrate that defense counsel was deficient in presenting the above evidence in this manner. See Strickland at 687, 694.
 {¶ 60} Similarly, appellant argues that defense counsel failed to proffer Dr. Howard's opinion as to a battered woman's likelihood of using a weapon when the battered person is no longer in a threatening atmosphere. Appellant recognizes that the trial court did not allow such testimony into evidence and that we have no evidence as to what the proffer would entail. If an ineffective assistance of counsel claim concerns facts that are outside the record, we cannot consider the claim on direct appeal because we can only consider matters contained in the record. State v. Cooperrider (1983), 4 Ohio St.3d 226, 228. Thus, here, we cannot determine ineffective assistance of counsel from defense counsel's failure to proffer the opinion. Id.
 {¶ 61} Additionally, appellant maintains that defense counsel failed to question Dr. Howard about the facts underlying his opinion before having Dr. Howard present his opinion. Under Evid.R. 705, an "expert may testify in terms of opinion or inference and give his reasons therefor after disclosure of the underlying facts or data." Evid.R. 705 requires the expert "`to disclose the underlying facts or data prior to'" rendering the expert opinion. Steenbergh v. Juvan Upholstering Mfg.Co., Inc. (Nov. 23, 1981), Portage App. No. 1105, quoting Staff Notes to Evid.R. 705. Here, while the record demonstrates that defense counsel failed to adhere to Evid.R. 705, such failure did not prejudice appellant because the trial court allowed Dr. Howard to present his opinion. SeeStrickland at 687, 694. Thus, we find no ineffective assistance of counsel on defense counsel's failure to adhere to Evid.R. 705. Id.
 {¶ 62} Moreover, we reject appellant's contention that defense counsel committed legal malpractice by objecting to Dr. Malinky's presence in the courtroom during Dr. Howard's testimony. As appellant asserts, the trial court has discretion to allow one party's expert witness to remain in the courtroom during testimony from an opposing party's expert witness. SeeLewis v. Owen (C.A.10, 1968), 395 F.2d 537, 541; Hamel v. General MotorsCorp. (D.Kan. 1990), Kansas District Court No. 86-4388-R. However, we cannot question defense counsel's trial strategy for asking the trial court to keep Dr. Malinky out of the courtroom during Dr. Howard's testimony because witness separation orders seek "to prevent a witness from shaping or fabricating his testimony to conform to testimony previously given." State v. Jones (July 14, 1980), Athens App. No. 1025.
 {¶ 63} Further, appellant claims that her defense counsel was ineffective by not obtaining a jury instruction on any lesser-included offenses. In support, appellant notes that, after her defense counsel declined lesser-included offense instructions, appellee placed on the record that it made an offer for appellant to plead to aggravated assault with no firearm specification. Appellant argues that appellee's action evinces that appellee "was aware how badly the trial had gone for the defense."
 {¶ 64} Although appellee's counsel stated that she was putting the plea offer on the record for her "own peace of mind[,]" appellee's counsel provided no indication that she was doing so because she thought defense counsel was not adequately representing appellant. (Tr. at 335.) Thus, being limited to the record before us, we cannot give credence to appellant's above assertion. See Cooperrider at 228.
 {¶ 65} Appellant also contends that the trial court was aware of defense counsel's deficient performance and believed it needed to discuss the plea offer with appellant. Again, the trial court made no indications, but stated that it wanted to make sure appellant "really understood" the ramifications of choosing to face the charged offense rather than accepting the plea offer. (Tr. at 337.) Again, being limited to the record before us, we cannot give credence to appellant's claim. See Cooperrider at 228.
 {¶ 66} In rejecting the above contentions, we further note that "the decision not to ask for an instruction on lesser included offenses is a decision that could be made by trial counsel without the express authority of" a defendant. State v. Edwards (1997), 119 Ohio App.3d 106,111-112. Similarly, defense counsel's "[f]ailure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel." State v.Griffie (1996), 74 Ohio St.3d 332, citing State v. Clayton (1980),62 Ohio St.2d 45.
 {¶ 67} In State v. Irwin, Hocking App. No. 03CA13, 2004-Ohio-1129, defense counsel did not seek a lesser-included offense instruction on involuntary manslaughter in a felony-murder case. Id. at ¶ 1, 31, 33. The defense counsel argued to the trier of fact that appellant had no culpability for the victim's death, and the Fourth District Court of Appeals noted that for defense counsel "[t]o later argue that [a]ppellant was culpable for [the victim's] death, but to a lesser extent, would have been wholly inconsistent with the defense theory." Id. at ¶ 33. Accordingly, the appellate court recognized that the defense counsel's decision not to obtain a lesser-included instruction was within the realm of trial strategy and that "[d]efense counsel's failure to request the instruction on the lesser included offense and to proceed on an all or nothing basis (guilty or not guilty on the charged crimes) is not ineffective assistance of counsel." Id.
 {¶ 68} Here, like Irwin and pursuant to Griffie, defense counsel chose to proceed on an "all or nothing basis," and defense counsel's decision to forgo the lesser-included offense instruction was within the realm of trial strategy that did not rise to the level of ineffective assistance.Irwin at ¶ 33; Griffie at 332. While appellant may now conclude that it would have been better to obtain the lesser-included instruction, the fact that there may have been "another and better strategy available does not amount to a breach of an essential duty to [defense counsel's] client." Clayton at 49.
 {¶ 69} Similarly, appellant asserts that defense counsel should have had appellant accept appellee's plea offer to aggravated assault with no firearm specification. However, the decision to accept a plea offer or proceed to trial is a personal right that only the defendant may make. SeeBoykin v. Alabama (1969), 395 U.S. 238, 243, fn. 5; Downtown v. Perini
(N.D.Ohio 1981), 511 F.Supp. 258, 267. Here, appellant wanted a trial, and defense counsel could not trump that decision.
 {¶ 70} Appellant also claims that defense counsel rendered ineffective assistance when he stated during closing argument that:
[Appellant] has already testified before you that she has no memory of even firing this gun, * * * and you have to assume that if you intend to do something, if it's your purpose to do that it's knowingly * * *.
(Tr. at 527.)
 {¶ 71} Appellant argues that defense counsel's above statement prompted the trial court to reveal its disfavor with defense counsel and appellant's case when the trial court interrupted the argument and ultimately instructed the jury about the differences between the mental element of "purpose" and "knowing." Although the trial court had concerns with defense counsel's use of the word "purpose," the trial court made no statement that would allow the jury to conclude that the trial court disfavored defense counsel or appellant's case. Moreover, the trial court subsequently instructed the jury that "[i]f during the course of the trial the Court said or did anything that you consider an indication of the Court's view of the facts, you're instructed to disregard it." (Tr. at 584.) The jury is presumed to follow jury instructions. Pang v. Minch
(1990), 53 Ohio St.3d 186, 195. Thus, the jury instruction alleviated appellant's concerns about the jury picking up on any alleged adverse reaction the trial court had against defense counsel or appellant's case.
 {¶ 72} We further reject appellant's contention that defense counsel's isolated statements above demonstrated his "general fallibility." Although counsel used the word "purpose" during his closing argument even though "knowing" is the requisite mental element to the felonious assault charge, defense counsel clarified that "it is our point that [appellant] * * * did not have the requisite knowledge and did not knowingly do this." (Tr. at 527.) We also note that the trial court subsequently instructed the jury that "knowingly" was the requisite mental element for felonious assault. Thus, based on the above, we conclude that appellant's use of the word "purpose" during closing argument did not rise to the level of ineffective assistance.
 {¶ 73} Next, appellant argues that defense counsel should have asked Dr. Malinky about how many times he provided expert assistance to prosecution agencies. However, we will not second-guess defense counsel's decision not to ask such a question, especially given that, as appellee concedes, we do not know from the record whether such a question would have elicited a helpful response. Carter at 558; Samatar at ¶ 88;Cooperrider at 228.
 {¶ 74} Lastly, appellant argues that defense counsel was ineffective by failing to object to appellee's remark in opening statements that the jury would not be hearing from Hall because "he didn't want to prosecute this case. * * * He is not going to swear under oath. He is not going to tell you what happened. He doesn't want to have anything to do with this." (Tr. at 29-30.) Appellant reasons that defense counsel needed to object to the statement because it constituted evidence from appellee.
 {¶ 75} However, a defense counsel's decision not to object is a matter within the realm of trial tactics and does not itself establish ineffective assistance of counsel. State v. Fisk, Summit App. No. 21196, 2003-Ohio-3149, at ¶ 9; State v. Ellison, Lucas App. No. L-02-1292, 2003-Ohio-6748, at ¶ 32; State v. Hunt (1984), 20 Ohio App.3d 310,311. Thus, "[t]he failure to object to error, alone, is not enough to sustain a claim of ineffectiveness." Hartman at 296.
 {¶ 76} Here, although defense counsel did not object to appellee's above statements, defense counsel countered the statements by telling the jury that Hall's reasons for not testifying have "nothing to do with this case." (Tr. at 541.) Likewise, defense counsel used Hall's absence to suggest that he "has gone on with his life" and that appellant also "needs to go on with her life" and "continue to be the successful citizen that she was prior to this incident." (Tr. at 542.) Accordingly, it was within the realm of legitimate trial strategy that defense counsel did not object to appellee's above statements, but, rather, decided to use the statements to support his closing argument. Hartman at 297; Fisk at 9; Ellison at ¶ 23; Hunt at 311. Thus, defense counsel did not render ineffective assistance in this regard.
 {¶ 77} Therefore, based on the above, we conclude that appellant's defense counsel's performance did not rise to the level of ineffective assistance. As such, we overrule appellant's first assignment of error.
 {¶ 78} In his second assignment of error, appellant argues that the trial court erred by instructing the jury on the meaning of "purpose," even though "purpose" was not an element of felonious assault. We disagree.
 {¶ 79} In challenging the trial court's decision to define "purpose" to the jury, appellant argues that the trial court conveyed disfavor with defense counsel and appellant's case. We have already rejected such contention above.
 {¶ 80} Appellant also asserts that the trial court had no discretion to sua sponte provide the instruction. However, appellant did not object to the jury instruction. Thus, appellant has waived all but plain error.State v. Barnes (2002), 94 Ohio St.3d 21, 27. Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial." Barnes at 27. Under the plain error standard:
* * * First, there must be an error, i.e., a deviation from a legal rule. * * * Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * Third, the error must have affected" substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. * * *
Barnes at 27.
 {¶ 81} "The giving of jury instructions is within the sound discretion of the trial court[.]" State v. Martens (1993), 90 Ohio App.3d 338,343. Additionally, we have previously recognized the benefits for a trial court to provide, under certain circumstances, a jury instruction that compares definitions of mental elements, even though one of the mental elements does not pertain to the case. City of Columbus v. Akins
(Sept. 27, 1984), Franklin App. No. 83AP-977. Likewise, the Eighth District Court of Appeals found no prejudice when a trial court provided a jury instruction that defined a mental state that did not pertain to the charged offense. State v. DePompei (Feb. 16, 1984), Cuyahoga App. No. 46838. The appellate court recognized that the trial court clearly instructed the jury as to which mental state applied to the charged offense. Id.
 {¶ 82} Here, under DePompei, appellant cannot establish that the instruction prejudiced her, given that the trial court also instructed the jury that it needed to find that appellant acted "knowingly," not "purposely," when she committed felonious assault. Moreover, in light ofAkins, we find no error from the trial court wanting to allow the jury to compare definitions of "purpose" and "knowing" after defense counsel referred to both mental states in his closing argument. Accordingly, based on the above, we need not reverse appellant's conviction under the plain error standard for the trial court's decision to define "purpose" in the jury instructions. As such, we overrule appellant's second assignment of error.
 {¶ 83} In summary, we overrule appellant's first and second assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Petreea and Travis, JJ., Concur.